EDWARD WARD et al. *vs.* DANIEL M. DULANEY et al.

When a marriage is proven, every presumption of law is in favor of its valid-
ity until rebutted, and if a party contracting marriage was sane at the time
it took place, proof of insanity before and after marriage will not invalidate
it.

A marriage took place in another state between D. and Mrs. L., and some
time after the marriage the wife died, when W. and others claiming to be
her heirs at law, filed a bill to declare the marriage contract void, alleging
the insanity of Mrs. L. at the time of the marriage with D., and claiming
the right to obtain possession of the property belonging to the wife at mar-
riage. *Held*, that the marriage contract is regarded a sacred obligation in
law, and will not be annulled for slight or doubtful causes.

If the marriage was void on account of insanity, this court will not say that
the subsequent cohabitation of the parties, after the wife became sane, will
ratify the previous invalid act upon the common law rule, that consent and
cohabitation will make a valid marriage ; but, taking it for granted that it
was a nullity and void, and incapable of confirmation, *held*, then, that Mrs.
D. was a *feme sole*, and, as such, it was necessary she should have asserted
her rights according to the rules applicable to every one ; D., by possessing
himself of her property, was a wrong-doer, and acquired no right to retain
it ; an action for its recovery immediately accrued to her, and it became
necessary for her to assert her rights according to law, within six years after
the cause of action accrued, or if insane at that time, within six years after
the removal of the disability ; this she did not do, and the plaintiffs can assert
no right but through her, for if the statute would bar a recovery by her, it
will bar this action.

As the evidence establishes the fact that she was sane after the date of the
alleged marriage, at least six years before her decease, and she commenced
no action for the recovery of the property ; *held*, that the defendant's plea of
six years statute of limitation must be sustained.

IN error from the superior chancery court; Hon. Stephen
Cocke, chancellor.

This was a suit originally instituted by bill in the superior
chancery court by Ward and others, claiming to be the heirs
of Mrs. Loomis, to annul a marriage contract which Mrs.
Loomis had before her death entered into with Daniel M.
Dulaney, the defendant in error, and also to obtain possession

of all the property Dulaney obtained by his marriage with Mrs. Loomis in her lifetime. The facts of the case as shown by the record are, that in the state of North Carolina, in June 1826, Dulaney was married to Mrs. Loomis, who had been a widow of considerable property; and the parties lived together after marriage as man and wife, for about nine months, when they separated, Dulaney making provision for the comfort and support of his wife, until her death, which took place in 1836, and he subsequently removed to the state of Mississippi.

It was in proof that Mrs. Loomis, both before and after her marriage with Dulaney, had intervals of apparent insanity; and the bill of plaintiffs in error charges that Mrs. Loomis was a lunatic at the time she was married to Dulaney, and therefore incapable of making a marriage contract, and further prays that the marriage may be declared void, and that they, as her heirs and representatives, may be put in possession of her property, now claimed by Dulaney, her assumed husband, under the laws of North Carolina. The defendants deny the charge of insanity of Mrs. Loomis, at the time of her marriage with Dulaney, or that any undue advantage was taken by Dulaney to contract the marriage, and that by virtue of the same, he, (Dulaney,) under the laws of North Carolina, the state in which the marriage took place, became possessed of all his wife's personal estate, and choses in action she had at the time of marriage; and defendants in error rely also upon the statute of limitations of the state which requires persons *non compotes mentis* to claim their rights within six years after they shall have been restored to their proper mind; and that if Mrs. Loomis was insane at the time of her marriage, she subsequently, within that period of time, was restored to sound mind, and her heirs cannot claim more than she could if living at the filing of the bill by plaintiffs in error, and she being barred by law, if living, from suing, they are also.

The court below dismissed the bill of complainants, from which decision they prayed a writ of error to this court.

*John Delafield, jr.*, for plaintiffs in error, argued the case at length, and filed an elaborate printed brief.

Ward et al. *v.* Dulaney et al.

*T. J. Wharton,* on the same side, made an elaborate oral argument, but filed no brief.

*A. C. Baine,* on the same side, filed a lengthy brief in the case.

*William R. Miles,* for defendants in error, argued the case orally at length before the court.

*Dyer & Hooker,* on the same side, filed an elaborate written argument in the case, reviewing at length the facts and law of the case.

Mr. Justice YERGER delivered the opinion of the court.

In the year 1842, the complainants, all of whom are minors, suing by their next friend, George W. Penn, except Eliza Jane Hall, who joins with her husband, filed their bill in the superior court of chancery, claiming by representation in place of their father, Eli W. Ward, deceased, to be the heirs at law and distributees according to the laws of North Carolina, of their grand aunt, Alice Dulaney or Loomis, who, it is alleged, died intestate and unmarried in Onslow county, North Carolina, on the — day of September, in the year 1836. The bill states that Alice, the aunt of the complainants, was in her lifetime seized and possessed of a large real and personal estate, and while so seized and possessed become insane, and incapable of making any kind of contract, whether of marriage or otherwise. That the defendant, Daniel M. Dulaney, taking advantage of this mental alienation, and intending to cheat and defraud her, took possession of her whole property, and now holds the same, claiming it as his own under a pretended contract of marriage; when, if any such pretended contract was made, the same was utterly null and void, because of the insanity of their aunt, and her consequent incapacity to contract. A decree for an account and distribution is sought. The defendant answers and positively-denies the insanity of Mrs. Loomis, as alleged in the bill, and avers her marriage with him on the 8th day of June, 1826, at which time she was

Ward et al. *v.* Dulaney et al.

of perfectly sound mind. He states that they lived together as man and wife about nine months, when they separated, and that he made ample provision for her comfortable support and maintenance until her decease, which occurred on the — day of September, in the year 1836. He insists, that by virtue of this marriage, he became entitled by the laws of North Carolina, where the marriage took place, to all the personal estate and choses in action of Mrs. Loomis. He also relies upon the statute of limitations, alleging that the lady, if not sane on the day of the alleged marriage, became so afterwards, at a period ten years preceding her decease, and being so *compos mentis*, was capable of asserting and maintaining her own rights against defendant, and recovering the property from him if she was sole and unmarried as alleged, and that complainants are therefore barred from maintaining this suit. The chancellor dismissed the bill, from which decree an appeal has been taken to this court. On this record, three questions are presented for our consideration. 1. Was Mrs. Loomis sane on the 8th day of June, 1826, the date of the alleged marriage? 2. If not then sane, did she afterwards become so at any period within six years before the commencement of this suit? 3. If so, will the statute of limitations bar the right of complainants to recover in this suit? The testimony in the record is voluminous, and on some points conflicting and irreconcilable. The case, in many of its circumstances, is novel and interesting; the arguments of counsel have been able and elaborate; the amount of property involved is large, and the decision we make may have an important bearing upon the reputation and character of some of the parties. We have, therefore, endeavored to give to the case that calm and rational investigation which these considerations seemed to demand from us.

The facts in the record about which there seems to be no dispute are these. The parties were domiciled in the county of Onslow, in the state of North Carolina. They were both connected with most respectable and influential families in the county; both were in comfortable, and in what might be considered in that county, affluent pecuniary circumstances.

35*

Their estates were nearly equal in point of value; the lady having rather more property, but owing more debts. Both had reached the prime of life, and had been previously married. The defendant Dulaney was one of the most popular and influential men in the county; had represented it in the legislature of the state, and had a high standing for honor and integrity. The lady was the widow of Doctor Loomis, upon whose estate she had administered, and in the management of which and of business generally she had displayed shrewdness, good sense, and clear judgment, and up to the year 1822, by the testimony of every witness, was remarkable for her intelligence, her ladylike demeanor and social virtues. At that period of time it is alleged, a change was developed in her character; that her mental faculties became impaired, evincing symptoms of derangement, gradually increasing in strength until the 8th day of June, 1826, the date of the alleged marriage, when it is said she had become entirely insane, destitute of will, and incapable of contracting. If this be so, the pretended marriage was a nullity, and conferred none of the rights of a husband upon the defendant.

The contract of marriage, like all other contracts, to be valid and obligatory, requires the assent of both parties. If either party, from imbecility of mind or deranged intellect, be incapable of volition or unable to comprehend the nature of the engagement which they profess to make, the marriage will for such cause be declared null and void. But this contract is so important in its consequences, the rights, duties, obligations and responsibilities which it creates and imposes are of so delicate and important a character, involving not only the happiness, well-being, and respectability of the parties themselves, but also the honor and peace of families, that the policy of the law requires courts of justice to sustain and uphold it, unless the proof be entirely clear and satisfactory, leaving no reasonable doubt upon the mind of the incapacity of the party and the consequent invalidity of the marriage. What degree of mental imbecility, what extent of intellectual alienation, will suffice to annul a contract of marriage, it is difficult to pronounce; certainly mere weakness of intellect, or even great

Ward et al. *v.* Dulaney et al.

eccentricity of conduct, unless it reach a point that evinces inability to comprehend the subject-matter of the contract, will not suffice, and every principle of sound policy and humanity admonishes us, that a contract so important in its social rela-tions, and bearing so materially on the peace and happiness of families, should not be set aside upon slight grounds, or on less proof than would suffice to annul contracts less sacred and im-portant in their nature. With this view of the principles which should guide us in our investigations in this case, we will turn our attention to the proof.

In the first place, we must bear in mind, that it is proved and admitted a marriage in form, was celebrated between the parties, and every presumption of law is, therefore, in favor of its validity, until rebutted. The answer of the defendant, Dulaney, denying the charge of insanity, is also evidence in his favor until disproved. If the party was sane at the time of the marriage, proof of insanity before and after will not invalidate it.

The main witness relied upon by complainants to sustain the bill, is Nathaniel L. Mitchell. He was a nephew of the lady, about five years of age when she first became a widow, and about seventeen when she was married to Dulaney, and if the marriage be null, is entitled to a distributive share of the estate, but that his claim seems to be barred by the statute of limitations. He was raised by Mrs. Dulaney, and regarded her, as he states, in the light of a parent, and he was present at the marriage. The counsel for complainants have not therefore without much reason placed great stress upon his testimony. Mitchell states, that his aunt was a widow about twelve years. For the first eight or nine years she was rarely without the most brilliant offers of marriage. Among her suitors was Dulaney, who was twice rejected. She was reputed rich, fashionable, remarkable for her good judgment in all business matters, having speedily settled up the affairs of her deceased husband, upon whose estate she had adminis-tered, and also purchased from, and paid the other heirs for their interest in the estate by means of her economy and thrift. About eight or nine years after her husband's death,

a change was observed in her conduct. She became passionately attached to Harris Loomis, a nephew of her deceased husband, and who was about twelve years older than witness, and had also been raised by and lived with Mrs. Loomis, until his marriage to a Miss Mitchell of Newbern. Before this marriage, the change in her conduct was exhibited. She grew callous and indifferent about the success of her business, negligent of her husband's affairs, and alive only to every interest and whim of Harris. He did not reciprocate her love. She became restless, would frequently cry all night, throwing herself first in bed, and then out of it, before the fire, indulging her grief in the wildest manner. Harris married, and this event seemed to fix her misery forever, dethroned her reason, and for a length of time she seemed unconscious, that she was the head of a family or household or large estate. About a year after this marriage, the wife of Harris died, and that event rekindled her flame, and she seemed to live in another but equally unreasonable sphere of action. She aroused herself to the most intense action, and as if spurred on in the daring enterprise to accumulate still more wealth to lay at the feet of Harris, she would labor almost night and day. Her economy was niggardly thrift. She spun and wove with her own hands, and wore her own home-made frocks, such as before she had never been used to. She would go and remain whole days on her plantation, and return covered with dirt and dust, and blistered by the sun and the hardest labor, and so for a season she would continue, and then relapse of despair into entire indifference. Harris soon afterwards married a second time, a sister of his former wife. Now then she would seem to bring to her heart every thing calculated to increase her matchless misery; deep-rooted despair assumed its conquest over her, and she no longer recovered, though she had partial lucid intervals. A stranger, or long absent acquaintance, would think her herself again, for a half hour or such a time. The witness retained almost unlimited influence over her; if a trade was proposed, he persuaded her into it or out of it, and so about almost every thing, about the time of her marriage, and for some time previous. She

moved to no end, and labored to no fixed object, but was the embodiment of fixed misery and despair itself, frequently asking if grief would not kill its victim.  Her miserable state of mind extended its baneful influence throughout her whole household, and indeed to her nearest neighbors; old and dilapidated people being called in to cry with her and match their miseries.  She abandoned her former home, fine house, elegant furniture, &c., and took up entirely at her Sound plantation, which was far more retired, gloomy, and more plainly furnished.  This she made the desolate abode of wretchedness.  These facts were familiar to all her acquaintances.  Still her business being managed by overseers, who felt the influence of the watchful eyes of expectant heirs, no one presumed to make a move to take her business out of her hands, upon the ground of insanity.  Some kind of a change, all agreed to be necessary.  Some thought a good husband would reanimate her, others advised her to break up housekeeping and hire out the land and negroes, and that travel would restore her.  Those who advised matrimony, seemed to prevail.  For, by some means, Col. D. M. Dulaney, being a man of right age and respectability, and at the time very popular in the country, was induced, by some motive unknown to witness, to become a suitor a third time, and this suit proved successful, for he married her.  The witness states that he was present at the marriage, as also was B. F. Dulaney, a brother of defendant, and William Mitchell, the uncle of witness, a justice of the peace, who performed the ceremony.  Witness does not recollect if any others were present, though one or two might have been.  He states that Dulaney, knowing his influence over his aunt, courted witness, who agreed with her friends, that a change of some kind was necessary, and believing that a marriage with such a man as Dulaney might restore her to reason and happiness, he forwarded Dulaney's views.  He would attend their interviews, hear Dulaney's speeches, and properly temper and direct them.  Perhaps for a time the idea (of marriage) would be laughed to scorn, and then for a time the nurslings of her grief would interpose and so on; again a happy preparation by witness in advance, would cause her to listen with reasonable attention to

Dulaney's proposals, assenting and agreeing to them, and even adding her own conditions for making some suitable gift of property to witness, and perhaps others; to all of which, Dulaney gave a ready assent, though this thing was never done. As soon as Dulaney was out of sight, she would cease to remember or know a thing about any engagement she had entered into with him. Such was the case up to the very day set by Dulaney for their marriage, a fact so well known to him, that it was made the duty of witness to keep her right. Witness permitted her to forget all about the day for the marriage, but made some little preparation for it himself, by sending up to her former well furnished house for some few things deemed necessary. The morning arrived. She was ignorant of it; chanced to be seized with one of her industrious fits; drew on one of the two old home-spun coats she had fabricated at home, and went into the field, a mile from the house, there remained till witness went and brought her home, to prepare for the marriage, by some plausible pretext. He summoned her two maids to wash off the dirt and dust that covered her, and to dress her. When he made her aware of the object and necessity of preparation, she was greatly astonished and rebelled against the idea, denying that any thing she had said could be so construed; at any rate, she was resolved to have no more of it, but to tell Dulaney, on his arrival, to harbor no longer so mistaken an expectation. Such was her condition when Dulaney drove up in his gig. Witness gave him to understand that she was rather a worse case that day than usual. Witness succeeded in getting her to dress, (to receive company, not to get married,) in simple, plain every-day style, except her shoes and stockings, which it is his impression he could not get her to change. Thus prepared, he introduced Dulaney into her room, left them alone for a season, until he felt pretty sure there would be no disappointment. She had been got into the mood of talking, half jesting, &c., on the subject, half way yielding, and half way repelling, &c. The magistrate with the brother of Dulaney arrived, and Dulaney and witness urged her at once, then and immediately, to make him and herself happy, &c. She laughed as if at a farce, and oft re-

Ward et al. *v.* Dulaney et al.

peated, " Oh! no! no!" &c., but, at the same time, not struggling hard to get away, caused Dulaney to rise and pull her with reluctant steps along, with her feet in her old slipshod shoes.    The witness thus proceeds : They were standing before the squire and Benjamin F. Dulaney and myself, during the whole of which time she never ceased to struggle gently to be released, and to exclaim, " No! no! never! it is preposterous.    What consummate folly! what are you doing? " laughing the while.    The question as usual being put to Dulaney, he gave the customary assent.    The question, when put to her, she heard not, or heeded not if she heard, keeping up her everlasting " No! no!" &c.    But laughed and appeared pleased to have done with it, as if really it was not a wedding, but a sham representation of one.    That evening she presided at the head of the table, appeared quite cheerful, as much at least as her shattered faculties could·indicate, and then it was, at the table, she for the first time seemed to reflect about it, and think " she had committed a great folly," to use her own words.    This marriage seemed to arouse her for a while to a juster consciousness of things, and a more quiet state of feeling, and certainly for a short time promised to verify the prediction of those of her friends who advised marriage.    The next day, Dulaney took her to his home, during which ride of twelve miles, she seemed composed, serious, but reconciled. How long she so continued, witness cannot state with any accuracy, but he felt greatly relieved at having placed her in the hands of a man in whom he felt the utmost confidence, and witness then roamed more at large.    We have thus given the substance of this most remarkable deposition, using mostly the very language of the witness.    Before commenting upon it, we will briefly state the remaining proof in the cause.

Jacob J. Doty states, that he knew the lady for about twenty years.    She was for many years subject to hysterics, but he does not think she was considered of unsound mind till the spring of 1822, after which witness did not·believe she had mind enough to be contented with any act of her own for a whole week together.    He was often at her house with Harris Loomis and Eli W. Ward, (the father of complainants,) after

Ward et al. *v.* Dulaney et al.

the spring of 1822, when she was quite crazy. Common report stated her to be so. " As crazy as the devil, as crazy as a loon, and the crazy widow," were by-words, in reference to her. He has seen her at lucid intervals, when she appeared pretty well, but not of like mind as previous to the spring of 1822. Again, he has seen her passionate and sinking therefrom into apathy and apparent misery. Sometimes quite dressy, and again as neglectful. The affair of love with Harris Loomis was believed by some of her most intimate friends to be the cause of her situation.

Joseph D. Ward states, that he was an intimate friend of the father of complainants. He knew Mrs. Dulaney from infancy. She had always been proverbial, up to a certain period, for industry, economy, and notableness; but some time before her marriage with Dulaney, it was generally known in the county and elsewhere around, that her mind from some cause or other was radically affected. Few had better opportunities of knowing this than Dulaney, as they had been born in a mile of each other, resided in the same county, and were about the same age. At no time after her marriage, and for a considerable time before, was she *fully capable of making a contract.* The change in her condition was plain and perceptible to every one. Elizabeth Ventriss, Cassey Cowell, Owen Huggins, David Scott, Edward Scott, William Scott, Rebecca Hammond and Turner Ellis, testify to their opinion of her derangement, and state such acts, as tearing her clothes, attempting to set the house on fire, exposing her person, &c., and other acts of extravagance as evidence of derangement, which acts they say were generally known.

To counteract the effect of this testimony, the defendant has introduced a very large number of witnesses, who testify to the sanity of his wife, both before and after this marriage.

Edward Dudley says, he knew Mrs. Dulaney from his infancy to the period of marriage, and not only considered her of sane mind, but as possessed of rather a superior order of intellect. She lived but a mile from his father's, and the two families had constant and friendly intercourse. As an evidence of sanity, he states, that she administered on Dr.

Loomis' estate, and settled the same with energy and skill. In social intercourse and all business transactions she never acted in such a way as to excite a suspicion of insanity, nor did her relations ever treat her as a lunatic. Dulaney was a man of substantial property, maintained a high character for honor and integrity, which witness never heard impeached before or since his removal to Mississippi, and the separation between Dulaney and wife, was a source of great surprise and regret to the community generally. He thinks Dulaney was worth about twice as much property as his wife, when they married.

Daniel Ambrose testifies substantially to the same effect. He also proves that she was subject to hysterics every two or three months. He was consulted by her in relation to the settlement of her husband's estate, and he therefore had opportunities of judging in relation to the state of her mind. Her nephew Eli W. Ward and her brother Seth succeeded in borrowing most of her money. After the separation, Dulaney built her a comfortable house and furnished it well, and there Mrs. Dulaney resided.

Joseph M. French knew Mrs. Dulaney; never heard or suspected she was insane; frequently saw her passing by his father's on her way from one plantation to another, and she frequently stopped and consulted his father about her business and farm. Her conversation was sensible and business-like.

William P. Ferrand, a merchant with whom she did all her mercantile business till her marriage, proves her to have been " A smart old lady, and a keen, shrewd trader."

Edward Williams knew Mrs. Dulaney for twenty years; frequently saw her at the court-house attending to lawsuits connected with her deceased husband's estate, and was often at her house. He always believed her to be of sound mind, intelligent, and one who managed a large estate as well as any woman he ever knew. No man had a higher character in the county than Dulaney.

D. W. Sanders proves that Mrs. Dulaney was a relation of his, and for seven or eight years before she married Dulaney was an intimate friend, and at no time did he ever see the slightest symptom of insanity. Dulaney was in easy and inde-

pendent circumstances when he married. When he removed to Mississippi he possessed the friendship, entire confidence, and good-will of the family and relations of his wife.

David Ward was a relation of Mrs. Dulaney; knew her from his infancy; saw her not long before her death; considered her of sound mind before and after her marriage. She was of an irritable temperament, easily wrought upon by adverse circumstances, and would then fret and complain a good deal. Saw her frequently in company, where she conversed freely and with good sense; spoke freely to her friends about her business affairs, and complained much of her nephew, Eli W. Ward, who borrowed her money and refused to pay it, which was the cause of all her embarrassments. He also proves that Dulaney, after the separation, built her a house and furnished it, and also furnished her with every thing necessary for her maintenance.

Daniel L. Russell was an inmate in Mrs. Dulaney's house in 1822, before her marriage to defendant. He saw her frequently immediately before the marriage; she had the entire management of her business. In social intercourse she conducted herself with the utmost propriety, and was treated by her relations and intimate acquaintances with the most marked attention and respect. He considered her at the period of her marriage of perfectly sound mind, and never heard a different opinion expressed.

D. W. Simmons was acquainted with Mrs. Dulaney during the lifetime of her first husband, and up to her marriage with Dulaney. He often observed her skill in business; she was proverbial for industry and tact in the management of her domestic matters to great advantage, and never exhibited the least symptom of insanity.

Elizabeth Mitchell knew Alice Dulaney fifteen or twenty years before she married Dulaney. They were in the habit of visiting each other. She saw her frequently before and after her marriage, and never saw any thing in her conduct or action that would lead to the belief of her insanity; on the contrary, she attended to her business with care and dispatch. After the separation, Mrs. Dulaney boarded in the house with witness

for six months, and neither then nor at any time during her acquaintance did witness think her intellectual faculties were deranged.   Mrs. Dulaney was an industrious and business-like woman.

Nancy Ambrose was acquainted with her for twenty years or more before her marriage, and knew her from that time till her death.   She never showed any symptoms of insanity. Witness was a distant relation; they met occasionally, and she was intelligent on all subjects that were conversed upon.

Mary Dulaney did not know Alice Dulaney before her marriage to defendant.   A few days after that, defendant brought her to visit witness.   They met frequently afterwards for six years.   She was not insane; was intelligent and competent to transact business.   At the marriage of one of defendant's daughters, Alice Dulaney superintended the supper, and managed the household affairs with as much ability as any lady could.

Nancy Roberts knew Alice Dulaney after her marriage to defendant.   They visited each other frequently; she always considered her smart and intelligent; she conducted herself lady-like; she never met her but once before the marriage, and that was at a party at Dulaney's house.

Thomas D. Barbour knew Mrs. Dulaney six or seven years before, and four years after, her marriage with defendant.   He never thought she was insane, and her character for intelligence, and capacity to transact business, was as good as any lady's in the country.   He was frequently at the house of defendant after he married, and always thought her sane and intelligent.   He was at a large wedding party at defendant's, after his marriage, and at a large party at the house of Mrs. Loomis before the marriage, and on both occasions she displayed as much intelligence in receiving and entertaining the company, as any lady of witness' acquaintance.

Leonard B. Lipsey boarded with Mrs. Dulaney six or eight months, in the year 1831.   He always considered her sane, and a woman of better sense than the generality of women in that country.   She attended to her own household affairs.   He also saw her frequently before the marriage, passing from one plan-

tation to another, stopping at the house of witness' father. She attended to her own business, and attended to her own overseers.

Lemuel S. Lipsey proves the same facts in substance as the above witness.

Houston Roberts states, that he was a near neighbor of Dulaney, and distantly related to his wife. He frequently visited Dulaney after the marriage, and she visited at his house; she was intelligent, sane, and competent to transact business. He was at the wedding of one of Dulaney's daughters, and his wife Alice superintended the domestic affairs of the house on that occasion, with as much ability as any lady could.

George Q. Roberts saw her both before and after her marriage, and always considered her as sane and intelligent as any lady.

C. D. Roberts became acquainted with her after the marriage, and was intimate with her from that time until 1835. There was nothing like insanity about her; on the contrary, she was a very smart and intelligent woman.

Thomas B. Ives was married on the 2d March, 1826, at the residence of defendant. Mrs. Alice Loomis was present as a guest. Witness had a long conversation with her. She was intelligent, prudent and discreet. He did not see her again till after her marriage to Dulaney. He then saw her frequently for two or three years, and occasionally till 1831. Frequently visited at the house of Dulaney, and often saw his wife. He never saw any thing in her conduct bordering on insanity.

Helen D. Ives gives in substance the same testimony as the last named witnesses.

Several depositions were taken, which proved defendant's high character for honor and integrity as well in Mississippi as North Carolina. Defendant also read in evidence a bond executed on the 5th of November, 1822, by Alice Loomis, and sureties for the guardianship of Nathaniel L. Mitchell, and also the record of a suit brought in the year 1829, by Dulaney and wife against Eli W. Ward, the father of complainants, on two bonds made by him, payable to her before her marriage to Dulaney. One dated the 14th of November, 1822,

for $793; the other dated on the 1st of June, 1824, for $1100. The defendant, Ward, appeared and pleaded to this suit, payment, set-off, and the statute of limitations. The last plea was withdrawn, and in 1831, a judgment was rendered against him for about $3000. Subsequently, on the 6th of March, 1832, Eli W. Ward paid Dulaney $500 on account of this judgment, and Dulaney released the balance. Daniel Ambrose proves that this money was advanced by the father of Eli W. Ward, (Eli being insolvent.) in consideration that Dulaney would release the remainder.

Such is the substance of the voluminous testimony taken by the parties on each side of this interesting case. Can we pronounce after reading it, that the marriage of Daniel W. Dulaney and Alice Loomis was void, because of her insanity? . If we look to the marriage itself, aside from other proof, we do not find such a disparity in age, social position, or fortune, as is calculated to awaken a suspicion of weakness of intellect on one side and imposition on the other. Upon the contrary, the parties had known each other from infancy. They had been reared in the same circle of acquaintance. Their ages were about the same. In point of wealth there was but little difference, and that in favor of the defendant. Their social position was equal, being the most respectable in the county of their residence. She had been distinguished for industry, economy and intelligence. He was the most popular man in the county, and highly esteemed for honor and integrity, and was esteemed by the friends and relations of the lady as suitable in all respects for her husband. The marriage under such circumstances was not unnatural or unreasonable, and it must, therefore, require no slight degree of proof to annul or set aside a contract so equal in all respects, and which in itself has nothing that is calculated to awaken a suspicion of imposition or unfairness.

But again. If we look to the witnesses who have testified in the case, and to all the circumstances connected with it, we think the preponderance of proof, to speak no stronger, is decidedly in favor of the defendant and of the sanity of his wife. But we are told, and the argument is pressed earnestly

36*

and ingeniously upon us by the very able counsel for the complainants, that the witnesses for the defence only speak of impressions and give their opinions, while the complainants' witnesses testify to acts which are inconsistent with her sanity. There is great force in this argument, and we will endeavor to analyze the evidence briefly, in order to see if it fully sustains the position taken by counsel.

The witness Nathaniel L. Mitchell is chiefly relied upon to sustain this view of the case. What are the affirmative acts proved by him, by which the hypothesis of insanity is to be established?

I. It is said she conceived an unnatural and incestuous attachment for Harris Loomis, the nephew of her deceased husband. Is this fact, if true, evidence of insanity? We are not prepared so to pronounce it. The law of North Carolina is not in evidence before us, and we cannot say, therefore, whether a marriage between the parties was prohibited in that state or not. Our law does prohibit marriages between parties so related to each other, and in the absence of proof to the contrary, we must presume the same to be the law of North Carolina. We are willing to admit that the attachment of Mrs. Loomis to the nephew of her deceased husband, was immoral, improper, and very reprehensible, and that a marriage between them would have been illegal. Yet we do not know that on the score of morality it was more objectionable than the marriage of Harris Loomis to two sisters, which it seems was not prohibited by the laws of North Carolina.

But the argument, that, because the attachment to Harris Loomis was incestuous and immoral, it was therefore evidence of insanity, is more plausible than sound. If it be true, then the criminal code of all civilized nations, which denounces punishment upon parties guilty of these offences, is based upon wrong principles; and instead of punishing them as criminals, should bestow pity upon them as lunatics. We are not willing to subscribe to this theory, whose effects in practice would undermine the foundations of social order and good government.

But the evidence of Mitchell, in relation to this attachment,

so far from proving the insanity of Mrs. Loomis, tends, in our opinion, to the reverse. Prior to the first marriage of Harris Loomis, Mitchell says she used every effort to win his affection, and being unsuccesful, she exhibited excessive grief, which was increased by his marriage. That, on the death of his wife, she became more cheerful, renewed her attentions to him, and tried in every way to win his love, endeavoring, by the accumulation of property, to make herself more acceptable. On his second marriage, and her consequent failure to obtain his love, her misery was re-kindled, and her grief increased. Surely this conduct, instead of derangement, is evidence of thought and reflection.

But the witness tells, that she abandoned her elegant and finely furnished house, for one more retired and plainly furnished; dressed in home-made clothing, and became over-industrious, and going into the fields among her hands, and coming back covered with dirt and dust. If we look to the circumstances surrounding the lady at this period of her life, all this can be accounted for, without impeaching the sanity of her intellect, in a very natural and not improbable way. She had always been remarkable for industry and economy, and always given her personal attention to her own business, and about the time referred to by the witness, had become considerably involved and oppressed with debts. Harris Loomis, and Eli W. Ward, father of the complainants, had taken off and sold part of her slaves, as was proved by the witness, Edward Scott, and this caused her the deepest distress. What is there more natural, than that she should have been much harassed by this condition of her affairs, and should have been seen frequently in tears, and exhibiting other evidences of grief? What more probable and reasonable, than her withdrawal from her finely furnished home, the resort of the gay and fashionable, to another more distant and retired, where she could practise the economy and thrift necessary to reinstate her affairs, and relieve herself from pecuniary embarrassment? And what more natural, under such circumstances, than that she should dress more plainly, and exercise more than her usual economy and industry?

But again, when we come to the details of the marriage itself, we find statements by the witness totally inconsistent with the theory he is seeking to establish, and inconsistent with other parts of his own narrative. For instance, he says that his aunt, when the marriage was proposed to her, pronounced it " preposterous, absurd ; she would hear none of it ;" and yet suffered herself to be reluctantly dragged along before the magistrate, where she kept up a continued cry of " No ! no ! never !" &c. ; and when the usual question was put to her, that " She heard it not, or heeded not if she heard," but kept up her eternal " No ! no !" &c. According to his own testimony, however, we find her that evening presiding at the supper table, and exhibiting signs of cheerfulness ; and then he says she seemed for the first time to reflect, and said " she had committed a great folly." It must be obvious, if the lady several hours after the marriage took place was capable of making a reflection of this kind, she could not have been ignorant of the occurrence at the time. She must have known the fact that she was married ; and if she knew when it occurred, remembered it afterwards, and thus commented on it " as a great folly she had committed," the folly must have received her assent when it was committed. The statement of the witness shows then that she had mind enough to know what she did, memory enough to remember it afterwards, and judgment enough to reflect and comment upon the matter and character of the act she had committed. If this be true, it would seem to follow that she had all the capacity requisite to the validity of a contract. Corroborative of this view is the further statement of the witness, that next day Dulaney took her to his home, and during the ride of twelve miles " she seemed composed, serious, but reconciled."

We have thus endeavored, by this analysis of the evidence of the witness mainly relied upon by complainants, to show that it does not make out such a case of insanity or incapacity as would justify us in declaring the marriage void.

In relation to this witness we may remark, that his evidence was evidently written with a view to produce an effect, and that he permitted his imagination to give a coloring, in accord-

ance with a preconceived theory of insanity, to many incidents that were susceptible of a very different and more probable explanation. This may be accounted for to some extent by the fact, that the incidents of which he speaks mostly occurred between his thirteenth and seventeenth years; a time of life when he cannot be supposed entirely competent to analyze the course of conduct which to him may have appeared singular and eccentric, but which, when the causes were understood, may have been perfectly consistent with sanity. It is worthy of remark too, in this connection, that several of the witnesses state, that the lady was subject to occasional attacks of hysterics, and it is probable at such times she may have exhibited eccentricities of conduct which the witness was unable to account for, and which, to use his own language, "His subsequent investigations into human nature" induced him erroneously to ascribe to insanity. With regard to the testimony of Doty, we may remark, that he speaks of no acts, while the expressions which he says were used, as by-words in relation to the lady, are not entitled to much weight in this investigation. We know that they are common, unmeaning phrases, not unfrequently applied to individuals in whose conduct any thing extravagant is observed, without any intention on the part of those using them to impeach the sanity of the persons to whom they are applied. It is also probable that the attachment of Mrs. Loomis for Harris Loomis may have betrayed her into some ridiculous acts, and thus have given rise to the epithets spoken of by Doty. The witness, Joseph D. Ward, speaks of no acts of Mrs. Loomis evincing insanity, but gives it as his opinion that she was insane, and that Dulaney knew it, inasmuch as he stated after the separation, that he supposed her peculiarities of conduct before marriage arose from her pecuniary embarrassments.

The other witnesses of complainants testify to acts which could not in all probability have escaped the observation of Mitchell, if they had occurred, and which, from the minuteness of detail exhibited in his deposition, it seems almost certain he would have stated if they had been known to him. These witnesses are very ignorant and illiterate, and it is clear

from their testimony, occupied a social position very inferior to Mrs. Loomis, and they would, therefore, in all probability, have had little if any intimacy or association with her. Several of the women are proved to have been of unchaste conduct; and while this kind of evidence is not in itself sufficient to impeach their veracity, yet as it would tend to show that they could not in all probability have been on terms of intimacy with Mrs. Loomis, and would not, therefore, have had an equal opportunity with others differently situated, of forming a correct opinion in regard to her capacity and intellect, we cannot say that it is entirely irrelevant. We think, however, that the testimony of these witnesses, and also that of Mitchell, may be reconciled with that of the witnesses for defendants without necessarily impeaching their veracity. It is proved, as we before stated, by several witnesses, that Mrs. Loomis was subject to attacks of hysterics every two or three months. When we reflect that medical writers of the highest repute state, that paroxysms of this disease are frequently accompanied with depression of spirits, a temporary loss of sense and consciousness, and of command over the muscles of voluntary motion, which are either motionless or violently and irrationally agitated; the arms and legs being most generally affected, accompanied with vehement struggles, during which the hands are frequently struck on the breast, or the head lifted up or struck violently against the bed or floor; the patients sometimes tearing the hair or otherwise injuring themselves; sometimes shrieking out in wild cries, and at others bursting into boisterous laughter. See 2d vol. Cyclopedia of Practical Medicine, 562, 563. We can at once account for the acts spoken of by these witnesses in a very natural way, and at the same time in a manner entirely consistent with the sanity of Mrs. Loomis. And we can thus reconcile, what might otherwise seem the contradictory testimony of the witnesses on each side. This brings us to the consideration of the defendants' testimony, which establishes facts uncontradicted by the proof of complainants, and which are entirely inconsistent with the hypothesis of insanity. Those facts are these.

1. That she was, up to the period of the marriage and afterwards, in the habit of social intercourse among a large circle of friends, giving and attending parties, at which she demeaned herself in the reception of company with elegance and propriety, and conversed sensibly, freely, and familiarly upon all the topics that presented themselves without evincing any trace of insanity.

2. That she attended to her own business of every kind, made contracts for the employment of overseers, and managed and conducted the affairs of her plantations up to the period of her marriage, without the aid or assistance or interference of any one, displaying in the whole of it business capacity, tact, and shrewdness.

3. That she was appointed guardian of Nathaniel L. Mitchell, in November, 1822; gave bond for the performance of the duties of guardian, and continued to act as such without complaint, removal, or objection, up to the period of the marriage.

4. That she acted as her own housekeeper before the marriage, as housekeeper for Dulaney while they lived together, and afterwards kept house for herself, and displayed in the management of her domestic affairs as much skill, prudence, and capacity as any lady in the community. To corroborate and strengthen the whole of which facts, is the further circumstance, that none of defendants' witnesses, who are very numerous, whose acquaintance with her was of long standing before and after the marriage, some of whom are related to her, and all of whom had ample opportunity by means of intimate association of knowing her character and capacity, ever knew, heard, or suspected from any part of her conduct that she was insane. Not the least pregnant circumstance to sustain this view of the case, is the additional fact that Eli W. Ward, the father of the complainants, and who, if she was insane, must, according to the testimony of Doty, have known the fact, permitted himself to be sued by Dulaney in right of his wife as late as 1830; and after having pleaded the statute of limitations, withdrew it, and suffered the defendant to recover a judgment against him for nearly $3000, without

opposing his right to sue or attempting to resist a recovery, because of the invalidity of the marriage or the insanity of his aunt.

Nor ought we to overlook in this connection the fact, that the magistrate who performed the marriage ceremony was the uncle of the witness Mitchell, and cannot be supposed to have lent himself without motive to the performance of an act which excluded his nephew from a large estate, that he would otherwise in all probability have received. In view then of all the facts in this case, taking into consideration the statement of Mitchell, that the relations of his aunt advised her marriage to Dulaney; that in the marriage itself there was not that disparity of age, fortune, character, or social position which should awaken distrust, and the improbability that a man of Dulaney's character and standing for honor and integrity, would have connected himself by marriage with a woman known to be insane, without some more powerful motive than is disclosed in this record; we are constrained to pronounce that the complainants have not proven the allegations of the bill.

II. If, however, it be conceded that Mrs. Loomis was insane at the date of the marriage, the question still remains, Was she afterwards sane at any period before her death, and if so, what effect would that fact have on this case?

The proof on this point seems to leave no room for doubt. Mitchell proves that she had lucid intervals before the marriage. Doty proves the same fact. While Elizabeth Mitchell, Mary Dulaney, Thomas B. Ives, Helen Ives, Nancy Ambrose, Thomas D. Barbour, Leonard Lipsey and many others prove that she was entirely sane after the marriage. These witnesses saw her frequently and at different times, and never saw the least symptom of insanity. Elizabeth Mitchell boarded in the same house with her for six months, and Leonard Lipsey was a boarder in her house for a like period, during which she managed the affairs of her household, evincing no insanity. This proof clearly shows that she was sane subsequent to the marriage. This period of sanity is shown to have been while she lived with Dulaney, as well as after the separation. If the marriage was void on account of insanity,

we will not say, that her subsequent cohabitation with him, after she became sane, would ratify the previous invalid act, upon the common law rule that consent and cohabitation make a valid marriage, but we take it for granted that it was a nullity, and void, and incapable of confirmation. In this view of the case, Mrs. Dulaney was a *feme sole,* and as such it was necessary that she should have asserted her rights in the manner and according to the rules applicable to every one else. And as Dulaney by possessing himself of her property was a wrong-doer, and acquired no right to retain it, an action for its recovery immediately accrued to her, and it became necessary for her to assert this right, according to our law, within six years after the cause of action accrued, or if insane at that time, within six years after the removal of that disability. This she did not do, and as the complainants can assert no right but through her, if the statute would bar a recovery by her, it will bar their action also. Inasmuch, then, as the evidence in our opinion establishes the fact, that she was sane after the date of the alleged marriage at least six years before his decease, and commenced no action for the recovery of the property, we are of opinion that, in this view of the case, the defendant's plea of the statute of limitations must be sustained, and the decree of the chancellor affirmed.

Decree affirmed.