Shackelford, J.,
delivered the opinion of the Court.
*19 The plaintiff in error, a free man of color, was indicted at the January Term, 1867, of the Circuit Court of Montgomery County, for bigamy. He was arraigned and tried at the same term of the Court before a jury of the county, and was convicted and sentenced to two years imprisonment in the j penitentiary of the State. Motions for a new trial and in arrest of judgment, were entered and severally overruled, from which he has appealed in error, to this Court. The facts of the case are substantially as follows:
In 1856 the plaintiff in error was a slave, the property of Wilson O. McReynolds, a citizen of Montgomery, Tennessee. During that year, the plaintiff in error and Eliza Elder, a slave, were married; the marriage rites were solemnized by Ered. Martin, a colored preacher; it was by and with the consent of the owners of the slaves. They continued to live together as man and wife, until about the 1st of January, 1867; they had one child. On the 17th of January 1867, the plaintiff in error procured a license of marriage from the County Court Clerk of Montgomery County, and the rites of marriage were solemnized between the plaintiff in error and one Betsy Edrington, a free woman of color. On the trial of the cause, the Court, after a lengthy and elaborate charge to the jury, summed up his conclusion upon the law of the case, as follows: If the proof shows the plaintiff in error had, prior 'to his freedom, contracted a marriage with a woman of his color, and lived with her as her husband; in other words, that the two lived together as man and wife, they are now legally such, and *20 if the plaintiff in error bas married another woman while his wife he may have first married, was living, he is guilty as charged in the indictment, etc., etc.
This is a novel case, and presents an interesting question, and is one of great importance, involving the domestic relations of that class of persons who have been recently released from the condition of slaves and given the rights and privileges of free persons. For the determination of the question involved, it is necessary to look to the status and condition of these persons while in a state of slavery, and see what rights and privileges were accorded them.
The municipal law did not recognize the rites of marriage between slaves; they had no civil rights, except where the right of freedom was involved, in which case, they could prosecute a suit by their next friend; 'or in cases affecting his life, he was tried as a freeman; unconditional submission to the will of the master was the duty of the slave; he was protected in life and limb from his violence; they were permitted to select their wives, and were often married by a preacher of their own race; sometimes took up and cohabited together, and were recognized as husband and wife by their owners.
They were generally happy and contented in the humble condition; the cares of the future did not press upon them; their wants were supplied by their owners, and their children provided for. But the institution has ceased, with all of its complications, and they are now given the rights and privileges of citizens. It has devolved upon the Courts the duty of declaring the rules *21 of law applicable to them in tbeir domestic relations growing out of tbeir changed condition.
Tbe slave having no civil rights, could they contract in marriage while in a state of slavery so as to he binding upon them after their emancipation? Marriage is defined to be a civil contract. Lord Roberson, a Scotch Judge, in a passage approvingly quoted by Judge Story, and by Bishop in his work on M. and D., ss. 6, says: “ It is a contract sui generis, differing, in some respects, from all other contracts, so that the rules of law which are applicable in expounding and enforcing other contracts may not apply to this.”
The contract of marriage is the most important of all human transactions; it is the very basis of the whole fabric of civilized'" society. The status of marriage is juris gentium, and the foundation, of it like that of all other contracts, rests on the consent of parties. But it differs from other contracts in this, that the rights, obligations, and duties arising from it are not left entirely to be regulated by the agreement of the parties, but are, to a certain extent, matters of municipal regulations, over which the parties have no control by any declaration of their will. It confers the status of ligitimacy on children born in wedlock, with all the consequential duties and privileges thence arising; it gives rise to the relations of consanguinity and affinity; in short, it pervades the whole system of civil society. Unlike other contracts, it cannot, in general, among civilized nations, be dissolved by mutual consent, and it subsists in full force, even although one of the parties should be forever rendered incapable, as *22 in the case of incurable insanity, or the like, from performing his part of the mutual contract.
In this State, the common law was changed, and marriages are contracted and governed by municipal law. The statute laws of the State were applicable to free persons, and did not apply to this class of persons at the time of their marriage, when in a state of slavery. Therefore, there being no statutory law recognizing marriage between slaves, we must look to the common law to see its effect upon persons who are not within the rule of municipal law, and be governed in our conclusions by analogous principles. At common law, it is the declared assent of the mind to the act of marriage, which makes it legal. Such as declare their assent shall be bound. Though the slave could make no civil contract, and the municipal law did not recognize the state of marriage between slaves, and a marriage was, in legal contemplation, absolutely void, and no civil rights could grow out of such a relation .while in a state of slavery, it must be admitted, there was the moral assent of the mind on the part of slaves to a marriage. They were usually married by one of their own race, and lived together as man and wife. What is the legal effect of such a marriage after their manumission, the parties continuing to cohabit as man and wife?
By the common law, if a boy under fourteen, or a girl under twelve years of age, marries, the marriage is inchoate and imperfect, and when either of them comes to the age of consent aforesaid; they may disagree, and declare the marriage void without any divorce *23 or sentence in the spiritual court; but, it is so far a marriage, that, if, at the age of consent, they agree to continue together, they need not be married again: 1 Black. Com., 437. It is a well settled rule, where marriages have been entered into, where one of the parties laboring under temporary insanity, if the parties continue to cohabit after a lucid interval, the cohabitation will render their marriage good: Bishop on M. and D., ss., 140. This principle was settled by this Court in the case of Cole vs. Cole, 5 Sneed, 57. The Court say: “If the proof established the wife was of unsound mind at the time of her marriage, there was abundant evidence she was after-wards restored, at least temporarily, and did not repudiate, but her acts and conduct recognized the validity of the marriage. A, lunatic on regaining his reason, may affirm a marriage celebrated while he was insane, and this without any new solemnization.” In "support of this principle the Court refer to Bishop, ss., 189; 6 Metcalf, 144. Apply these principles to the case under consideration. The plaintiff in error, while in a state of slavery, was married according to the usages and customs of the race; they continued to live together as man and wife until their emancipation in 1865; after their emancipation the relation of husband and wife continued until January, 1867, when he abandoned his wife and married another. At common law, we have shown it is the declared assent of the will to the act of marriage which makes it legal. Such as declare their assent shall be bound. Though the plaintiff in error was incapable of making any valid *24 contract while in a state of slavery, and the marriage was void, and he could have dissolved the relation as soon as he was capable of contracting, yet, he, having continued to live with the woman he had married in a state of slavery, it was a ratification of the marriage. Bishop, in .his work on Marriage, and Divorce? ss., 162, in reference to marriage of slaves, says: “If, after the emancipation, the parties live together as husband and wife, and if, before emancipation they were married in the form which either usage or law had established for the marriage of slaves, this subsequent mutual acknowledgment of each other as husband and wife, should be held to complete the act of matrimony, so as to make them lawfully and fully married from the time at which this subsequent living together commenced; ^and in support of this principle, he cites 3 Ir. Eq., 91; 23 Miss., 410; Pointer, on Marriage and Divorce, 157; and the case of Cole vs. Cole, 5 Sneed. Doubts existing in the public mind as to the validity of such marriages, while in a state of slavery, the Legislature, with a view to elevate this class of the population in morals, and to keep them together as families, who had contracted marriage in a state of slavery, on the 26th of May, 1866, passed “An Act to define the term ‘free persons of color,’ and to declare the rights of such persons.” The fifth section of said Act, is as follows : “That all free persons of color, who were living together as husband and wife, in this State, while in a state of slavery, are hereby, declared to be man and wife, and their children legitimately entitled to an inheritence in any property heretofore acquired or that *25 may be hereafter acquired, by said parents, to as full an extent .as white children are entitled, under existing laws of this State.”
The passage of this Act did not change or alter the law in reference to those who were married while in slavery, and continued to cohabit together as man and wife, after their emancipation. The marriage of such persons were made valid by their consenting to live together after their emancipation; and having given, while in a state of slavery, a moral assent, as soon as they were capable of contracting or legally assenting to the marriage, it would become valid.
The Act of the Legislature was proper, under the circumstances in which it was passed. It was supposed this class of persons were not embraced within the rules of law regulating marriage. The object of the Legislature was to give the sanction of law and bring within its rules, this class of persons in their domestic relations. Such being the principles of law governing this case, was the charge of the Court correct? He instructed the jury, if the plaintiff in error had, prior to his freedom, contracted a marriage with a woman of his color, and lived with her as husband, and had married another woman while his wife was .diving, he would be guilty as charged. Under this charge, if the plaintiff in error had married another woman while the wife he had married in a state of slavery was living, the jury were instructed he was guilty. This is erroneous. To constitute the crime of bigamy, there must be a valid marriage subsisting at the time of the second marriage. His Honor should have instructed the jury, if the plaintiff in error had married before his eman *26 cipation, and bad' continued to live and cohabit with his .wife he had married while in a state of slavery, after their freedom, it was a legal assent and ratification of the marriage; and the plaintiff in error having married another while the’ first marriage existed, was guilty.
The judgement of the Court, must be reversed, and a new trial awarded, when the law will be charged as settled in opinion.