## DOE v. ROE.

The duty of court and jury on a feigned issue out of chancery, on a bill filed to set aside a marriage on the ground of incapacity.

What is the mental unsoundness that incapacitates entering into the marriage relation.

THIS was a feigned issue sent down from the Court of Chancery to try the validity of a marriage.

The woman was the daughter of an ordained clergyman and the granddaughter of a former bishop of the Episcopal church. She was one of a family of five daughters and two sons, which moved in the higher walks of life.

In June, 1845, an Irishman, who could not read or write, was hired as a laborer by her father, and in March, 1846, she left home with him and was married to him. Her family searched for her and found her with him, in obscure lodgings, in New York. They had her taken from him and committed to the Bloomingdale asylum for the insane, and instituted proceedings to dissolve the marrage, on the ground of her mental incapacity to contract it.

Evidence was given tending to show that from early child-hood she had been wayward, willful, and difficult to govern; that with all the advantages of education she had learned less at the age of sixteen than her brothers at eight; that she had never been able to learn the multiplication table; that when full grown she was more fond of association with little chil-dren than with persons of her own age; that she was more prone to being with the servants than with the family; that she was slatternly and untidy in her room and her dress; that she had a passion for collecting old rags; that she was subject to paroxysms of violent passion; would use profane and obscene language, and be insolent to her parents; that she was habitually cruel, and took pleasure in the sufferings of animals; that she was greatly addicted to falsehood, and when detected would only laugh; that her memory was bad, her judgment weak, her passions violent, and she had no affection, but rather hatred, for her parents and her brothers and sisters; that she showed no emotion on the death of a brother and sis-ter; and was incapable of holding a connected conversation on any topic, but frequently talked with the cows and oxen as if they understood her.

On the part of the husband, who defended the action, some of the servants at the asylum, where she had been confined, were examined, and two physicians, who had been regularly licensed as such, but had never given any special attention to the disease of unsoundness of mind, who visited her at the asylum after she had been apprised of their intended visit, and who had prepared and propounded to her a series of questions, mostly so leading in character as to suggest the nature of the answers to them. One of the witnesses testified that his im-pression was, "not that she was a lunatic, but only an imbe-cile — no ailment, but only a want of mind."

The superintendent of the asylum testified that her mind was naturally unsound; her capacity for learning very small; ordinary affection wanting; her judgment defective, she act-ing from impulse, without considering consequences; cruel to

others, and subject to unusually rapid transitions from one feeling to another, without apparent cause.

*The Judge*, in charging the jury, explained to them how the case came before them, and what was their duty in regard to it.

The father of the girl had applied to the Court of Chancery to annul a marriage she had privately made with a man who had been in his employ as a common laborer, and had rested his claim on her alleged mental incapacity to make the contract, and that court had sent the case down to the circuit to have the witnesses examined, and to certify the opinion of both judge and jury on that point.

It was very rare for that court, after such an award of an issue, to pronounce a judgment unless both judge and jury agreed in opinion.

What his own opinion on the case was, the judge said it would be improper for him now to state, the present object being to obtain, for the guidance of the Chancellor, the opinion also of the jury on the question, whether there was a mental capacity on the part of the woman, to understand the nature of the contract which she had made.

The statute had said that marriage, so far as its validity in law was concerned, was a civil contract to which the consent of parties, capable in law of contracting, should be essential, and that when either of the parties should be incapable, for want of age or understanding, of consenting, the marriage should be void from the time its nullity should be declared by a court of competent authority.

Our statutes had made several provisions for mental derangement, but unfortunately had not always used the same language in describing it, and from this variety of language had arisen some conflict in the decisions of our courts.

Thus, in giving to the Court of Chancery power over their estates, the afflicted parties were spoken of as " idiots, lunatics and persons of unsound mind." In providing for last wills and testaments, they were spoken of as "idiots and persons of unsound mind." In exempting from punishment for crime,·

the language was "insanity and insane persons," and when the marital tie was treated of, the language was "capable of contracting," or "incapable for want of understanding."

And yet, nowhere in the statutes had any of these phrases been defined, nor was there any intimation, even, whether they had the same or different meanings, and thus no aid could be obtained from that source in determining what was the unsoundness of mind which was to work out the effects which the law prescribed.

And, unfortunately, science would render as little aid, for though great progress had been made within a few years, in a knowledge of the disease of mental unsoundness, and the remedies for it, yet the most skilled and profound of medical philosophers had not been able to agree upon any definition which would afford to the unlearned a test by which to determine its presence, and had agreed in only one thing, and that was in condemning as unsound the legal rule, and complaining that the law lagged behind science in dealing with it.

It was not strange that this uncertainty should exist, for there was probably no more difficult task than to ascertain where mental soundness ended, and unsoundness began.

And the judge said that he, therefore, had to regret that, in this case, he must present to the jury the simple question of mental capacity, without being able to proffer to them much aid, either from the law, or from science, in determining what was incapacity.

It must, therefore, be to them a simple question of fact, to be determined by their own good sense, whether the female, at the time she contracted marriage, had sufficient understanding to comprehend the nature and consequences of the act she was performing.

The inquiry for them was, whether it had been clearly proved that, at the time of contracting the marriage, she was laboring under such a defect of reason, from disease of the mind, or original malformation, as not to know the nature and quality of the act she was performing. The question as to her capacity was not to be put generally, but in reference to

the very act in question; and the inquiry would therefore be, whether she had, at the time of contracting the marriage, sufficient reason to know what she was doing, or was she laboring under such a mental aberration as to be unaware of the nature, character, and consequences of the act? To render her contract of marriage valid, she must have had memory and intelligence to know the nature of the act, and reason and will to enable her to compare and choose between the supposed advantage or gratification to be obtained by it, and the advantages to be obtained by abstaining from it. But if her intellectual powers were so deficient that she had not sufficient will or controlling mental power, or if, through the overwhelming violence of mental disease, her intellectual power was for the time obliterated, she was not capable of entering into a valid contract of marriage.

The allegation in this case was, that she was laboring under mental delusions, and that her mind was deficient from infancy, in the power of memory and of judgment, in the inability to distinguish between truth and falsehood, and in the want of natural affections.

As to delusions, the jury must remember that the testimony was derived mainly from members of her family; and while, on the one hand, the strong desire which they evidently entertained to break up this marriage, was to be considered as bearing upon the degree of weight which their testimony should receive, on the other hand, it was to be considered that they, of all others, would best know the true state of her mind.

As to the medical witnesses, the judge charged:—

The discoveries in the nature of the disease, and the improvements in the mode of its treatment, had been so great, in modern times, that it had become almost a distinct department of medical science, to which some practitioners devoted themselves exclusively. The opinions of such persons, especially when to their scientific knowledge they added the experience of personal care of the unsound, could never be safely disregarded by courts and juries.

Doe v. Roe.

And, on the other hand, the opinions of physicians, who had not devoted their particular attention to the disease, were not of any more value than the opinions of persons in other callings, nor, indeed, of so much value as the opinions of many, not educated to the profession, but who had been so situated as to have given particular attention to the disease, and to patients suffering under it.

He also charged the jury to regard with care the period of time at which the acts related were said to have been done, whether before or after the question in controversy had arisen; for all that were alleged to have happened after that period must be regarded with great caution, from the apprehension that they might be fabricated.

And all the acts of the party must be regarded, not single ones alone, so that it might be seen whether as a whole they were most consistent with soundness or unsoundness of mind.

As to memory, it must be borne in mind, that its power and strength were as various as the minds or the features of men — that sometimes it was exceedingly good in the manifestly insane, and very imperfect in the sane, and he doubted much whether there was such evidence of a condition of memory in this case as to warrant the conclusion of unsoundness.

As to her want of judgment, the testimony was of a different character, and would show if she could reason from cause to effect any farther than to perceive immediate consequences, or was capable of understanding the ultimate consequences of the act in question?

To apply the rule, was she capable of appreciating the consequences of allowing Patterson to visit her in her bedroom at night, after the family had retired, or the consequences of her running away at night to Snyder's, or of writing the letters to the young men, Sloan and Holmes?

And the jury would mark the difference between acts that evinced memory only, and those which showed the possession of judgment.

As to the want of veracity, if it had been made out to the satisfaction of the jury, they were carefully to inquire whether

it arose from a depraved heart, or a defective understanding? If she believed the falsehoods which she told, then she might justly be regarded as laboring under delusions, and if that was habitual, it would be strong evidence of a defective understanding, of an incapacity to distinguish between truth and falsehood — between right and wrong.

As to the want of affection, it was a common mark of insanity, and generally displayed itself toward those most closely related to the patient, on whose affection she could most certainly rely, and whose protection she could, with the greatest confidence, invoke.

After alluding to her behavior, on the deaths of her brother and sister, and her denial of the relationship between her and her parents, and her sisters, he referred to her affection for her husband, as evinced in her declarations and her letters, in her abiding with him, and her desire to return to him, and said it became material to inquire whether it extended any further than to regard him as the means of taking her beyond the parental control; whether she had judgment enough to appreciate any other consequence of her marriage, or whether she was destitute of those feelings which bind us to our fellow creatures, and which so much govern and affect our whole lives that the absence of them becomes evidence of defective understanding.

The judge then commented on the badges of unsoundness of mind which it was alleged were to be found in her personal deportment, in her behavior to animals, and to inanimate objects, in her hostility to her family, in her conduct in church, in her denial of a God, in her incapacity to learn, or to hold any connected conversation, and left it to the jury, with these rules, and under the evidence of the case, to determine the question submitted to them by the issue.

The jury found that she was incapable of contracting marriage.

[Upon this verdict, and the judge's certificate of approval of it, the marriage was dissolved, and she was continued in the lunatic asylum.

In a few months, by the connivance of some of the servants, she made

her escape from the asylum, joined her former husband, and was again married to him. They lived together about six months, when he abandoned her, and in a very short time she died.]