MEEKINS v. KINSELLA et al.

(Supreme Court, Appellate Division, First Department.   July 11, 1912.)

1. MARRIAGE (§ 60*)—ANNULMENT—PRESUMPTION OF SANITY—REBUTTAL.
    In an action to annul the marriage of plaintiff's sister with defendant on the ground that she was a lunatic, evidence *held* insufficient to overcome the presumption of sanity and validity of the marriage.
    [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 125–135; Dec. Dig. § 60.*]

2. MARRIAGE (§ 58*)—ANNULMENT.
    Code Civ. Proc. §§ 1743, 1747, authorizing the annulment of ,a lunatic's marriage where the incapacity is incurable, did not authorize an annulment on proof merely that she at times had insane delusions or hallucinations on other subjects, nor without proof that she was mentally incapable at the time of her marriage of understanding its nature, effect, and consequences.
    [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 115–123; Dec. Dig. § 58.*]

3. MARRIAGE (§ 60*)—ANNULMENT—PROOF.
    In an action to annul a lunatic's marriage, the presumption of sanity and of the validity of the marriage will prevail, unless overcome by clear and satisfactory proof.
    [Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 125–135; Dec. Dig. § 60.*]

    McLaughlin, J., dissenting.

Appeal from Special Term, New York County.

Action by Kate J. Meekins against Richard A. Kinsella, interpleaded with others.   From the judgment, plaintiff and defendants other than Kinsella appeal.   Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

William H. Hamilton, of New York City, for appellants.
J. Aspinwall Hodge, of New York City, for respondent.

LAUGHLIN, J.   This is an action under sections 1743 and 1747 of the Code of Civil Procedure, commenced on the 11th day of July, 1910, to annul the marriage of the plaintiff's sister to the defendant, Kinsella, which was celebrated on the 8th day of September, 1890, on the ground that she was a lunatic.   After the marriage, they occupied rooms together at different boarding houses, until the 17th day of January, when the wife was committed to the Bloomingdale Asylum on a summary ex parte adjudication that she was a lunatic, made by a justice of the Supreme Court on the evidence of two examiners in lunacy, and she has been there confined ever since.   The incompetent was born in the year 1846.   She contracted a former marriage on September 10, 1868, and, after living with her husband about six weeks, they separated, and she was divorced from him on the 22d day of August, 1871.   There was no issue of either marriage.   On the 13th day of June, 1891, a commission de lunatico inquirendo was duly issued out of the Supreme Court to inquire into her sanity, and it was therein duly adjudged on the 6th day of August, 1891, that she

was a lunatic, and one of her brothers was appointed committee of her person and estate; and he was succeeded by one of her sisters on the 22d day of September, 1898.  Her father and mother are dead.  The committee of the wife and her two brothers and three sisters, who are her next of kin, admit the material allegations of the complaint, and pray for the relief demanded by the plaintiff.  The husband denied that his wife was a lunatic at the time of the marriage, and pleaded laches and an equitable estoppel, upon the theory that he had always recognized the validity of the marriage to the knowledge of the plaintiff, who has acquiesced therein with full knowledge of the facts for a period of nearly 20 years.

[1] The husband appears always to have recognized and performed the obligations which he incurred by the marriage, and the validity of the marriage was never brought in question until the commencement of this action.  The fact that the adjudication would exclude the husband from sharing in the estate of the incompetent in case of her death, and would enable her sisters and brothers to take it all, does not preclude a recovery; but in weighing the testimony of the interested witnesses upon which the plaintiff's demand for a decree of annulment largely depends the court may properly consider the long acquiescence in the marriage by the sisters and brothers, for it tends to show that pecuniary interest in the estate, and not consideration for the incompetent, actuated the plaintiff in bringing the action, and especially should such testimony be most carefully scrutinized where, as here, it appears that the incompetent's favorite sister and her brother-in-law attended the wedding ceremony and festivities, and the annulment would be of no benefit to the incompetent and would serve no useful public purpose, for the incompetent is incurably insane, and there is no likelihood of issue.

The record contains the testimony of no physician or medical expert who saw the incompetent prior to the marriage.  The medical evidence consists of the testimony of the examiners in lunacy upon whose evidence she was committed and who saw her then for the first time, and the testimony of the superintendent of the asylum, who never saw her before she was committed.  The principal lay evidence with respect to the state of mind of the incompetent at and prior to the marriage was given by interested parties.  The contention on the part of the plaintiff is that at the time of the marriage the incompetent was suffering from paranoia, which is a chronic form of insanity of slow progression, and results usually from hereditary predisposition.  Her father was a prominent physician, and he lived until 1883.  Her mother died when she was quite young, and her father married again.  He made her an allowance, and she lived at boarding houses, and on his death she inherited property valued at $12,000.  One of her brothers testified that his father regarded her as physically and mentally unfit for the married state, and so informed Kinsella, who applied for her hand in marriage; but this testimony is controverted by Kinsella and by the fact that she was never restrained of her liberty, and was always permitted to go about unattended, and to make her own arrangements with respect to her home life and associates, and to pur-

chase her wearing apparel. She had been acquainted with Kinsella, and they had been friends for a period of 10 years, and were about the same age. She was fairly well educated, and was fond of reading. They became engaged the latter part of August, 1890. He was a Roman Catholic, and she was a Protestant. At his suggestion she made the necessary arrangements to have the marriage celebrated by a priest, and she selected a room which they were to occupy after their marriage. Only her favorite sister and the latter's husband were invited to the wedding, which took place at the rectory of St. Anne's Church in the evening. The priest who performed the ceremony has since died. After the marriage, the bride and groom and her sister and brother-in-law went to a public restaurant, and had a wedding supper, lasting some hours. The sister and brother-in-law who witnessed the marriage both testified. Neither of them discovered any act or conduct on the part of the incompetent during the evening that appeared to them to be irrational; and their evidence tends to show that she fully understood the occurrences of the evening and the consequences thereof. Testimony was given by interested witnesses to the effect that for a long time prior to the marriage she was somewhat eccentric, and at times had delusions with respect to being persecuted and annoyed, and hallucinations. The testimony of the medical experts tends to show that in the early stages of paranoia, and before it has so progressed that the mind has become completely absorbed in the delusions, the patient would be insane on any subject connected with the delusions, but fully competent to contract and transact business not connected with the delusions, and that they would not expect, in view of her state of mind at the time they examined her, that she was competent four months before to appreciate the effect of the marriage; but they, in effect, conceded that the facts disclosed by the testimony of her sister, brother-in-law, and husband with respect to her state of mind on the evening of the wedding showed that "she knew what she was about."

[2] Said sections 1743 and 1747 of the Code of Civil Procedure authorize an action to annul a marriage on the ground that one of the parties was "an idiot or a lunatic" at the time of the marriage, where the incapacity continues and is incurable. Counsel for the appellants contends that it is significant that the word "incompetency" was not used in the section, and that it shows a legislative intent to authorize the annulment in any case of mental disorder constituting lunacy in the sense in which that word is used in the Code of Civil Procedure with respect to the appointment of a committee of the person and property and as defined by section 28 of the General Construction Law, even though it may not show incompetency to contract generally. We are of opinion that this contention is not tenable. Section 7 of the Domestic Relations Law (chapter 14, Consol. Laws 1909) declares that, where either party "is incapable of consenting to a marriage for want of understanding," it is void from the time its nullity is declared by a court of competent jurisdiction. We are of opinion that the Legislature did not intend to authorize the annulment of a marriage on proof merely that one of the parties at times had

insane delusions or hallucinations on other subjects, and the word "lunacy" was here used in a broad sense, for at the time of the enactment of these sections of the Code of Civil Procedure section 4 of title 1 of chapter 8 of part 2 of the Revised Statutes contained a provision on the subject from which section 7 of the Domestic Relations Law was taken, which was, in effect, the same as the provision quoted from the Domestic Relations Law. Marriage is a civil contract, and, before it can be canceled on the ground of lunacy or for want of understanding on the part of one of the parties, it must be satisfactorily shown that the party in whose interest or right the action is brought was mentally incapable of understanding the nature, effect, and consequences of the marriage. Doe v. Roe, 1 Edm. Sel. Cas. 344; Forman v. Forman (Super. Ct.) 24 N. Y. Supp. 917; Kern v. Kern, 51 N. J. Eq. 574, 26 Atl. 837; Lewis v. Lewis, 44 Minn. 124, 46 N. W. 323, 9 L. R. A. 505, 20 Am. St. Rep. 559; St. George v. Biddeford, 76 Me. 593; Cannon v. Smalley, L. R. 10 Prob. Div. 96; Banks v. Goodfellow, L. R. 5 Q. B. 549. See, also, American Seamen's Friend Society v. Hopper, 33 N. Y. 619; Delafield v. Parish, 25 N. Y. 10; Riggs v. American Tract Society, 95 N. Y. 503; Matter of White, 121 N. Y. 406, 24 N. E. 935.

[3] There is a presumption, not only of sanity, but in favor of the validity of a marriage celebrated in due form, which, in the interests of society, should prevail, and particularly in the circumstances of this case, unless it is overcome by proof clear and satisfactory which stands the test of the most careful scrutiny. See Delafield v. Parish, supra; 1 Bishop on Marriage, Divorce & Separation, §§ 588, 589, 592, 599, 600, and 601; Banker v. Banker, 63 N. Y. 409; Ward v. Dulaney, 23 Miss. 410; Slais v. Slais, 9 Mo. App. 96; Kern v. Kern, supra; Anonymous, 4 Pick. (Mass.) 32.

We are of opinion that the evidence adduced in behalf of the plaintiff was insufficient to overcome the presumptions of sanity and validity of the marriage, and that the evidence, to which no objection was taken, satisfactorily shows that the plaintiff's sister was competent to marry, and therefore it is not necessary to consider the rulings on the evidence received to which objections interposed and exceptions taken. See Prime v. City of Yonkers, 131 App. Div. 110, 115 N. Y. Supp. 305; McSorley v. Hughes, 58 Hun, 360, 12 N. Y. Supp. 179, affirmed, 129 N. Y. 659, 30 N. E. 65.

It follows that the judgment should be affirmed, with costs.

INGRAHAM, P. J., and CLARKE and SCOTT, JJ., concur.

McLAUGHLIN, J. (dissenting). I am unable for the following reasons to concur in the opinion of Mr. Justice LAUGHLIN. The statute provides that:

"An action to annul a marriage on the ground that one of the parties thereto was a lunatic may be maintained at any time during the continuance of the lunacy, or after the death of the lunatic in that condition, and during the life of the other party to the marriage, by any relative of the lunatic who has an interest to avoid the marriage." Section 1747, Code of Civil Procedure.

The plaintiff is a sister of the incompetent, has an interest to avoid the marriage, and may, therefore, by express provision of the statute maintain the action.

After a careful consideration of the record, I am thoroughly convinced that, when the marriage ceremony was performed, the incompetent was a lunatic. The marriage took place September 8, 1890, and the incompetent then was about 44 years of age. About four months after the marriage she was committed to an insane asylum as suffering from paranoia, an incurable disease of slow evolution, has ever since remained there, and it is conceded—at least the fact is not disputed—that she is hopelessly insane. Immediately prior to and ever since the marriage she has been subject to hallucinations of various forms, but principally of being persecuted by various people, especially men, who were trying to do her bodily harm.

Even the husband, the respondent on this appeal, admitted at the trial that she was subject to hallucinations some three weeks after the marriage, and on one occasion before the marriage took place she complained of being persecuted at the hotel where she was then living, though there was no foundation whatever for her statement. In an affidavit verified by him on June 9, 1891, nine months after the marriage, in a proceeding to have a committee appointed of her person and property, he stated:

"The language and action of said Mary A. Kinsella during the eight months, and in the light of the later development during the last number of years, have been those of an insane person, and that, according to deponent's best judgment and belief, the said Mary A. Kinsella has been for the past six months of wholly unsound mind and understanding, and still is of unsound mind and understanding, and unfit for the government of herself or the management of her affairs."

In the same affidavit he gave numerous instances of irrational acts upon her part, one of which occurred the morning following the marriage, when she insisted he had said he was sorry he married her, when he had said nothing of the kind; another, where she insisted that persons had bored holes in the walls and ceiling of the room where they were living and were looking at her, when there were no holes; that at night she would get up and light the gas and go to deponent's side of the bed, and whisper in his ear that parties upstairs wanted to shoot both of them; that she would decline to drink water at the table for fear some one would poison her; that she warned the husband not to eat anything with white spots upon it because her enemies might poison them both; that frequently she would sit up all night for fear some injury might happen to her, and on one occasion opened the window and insisted upon calling a policeman to come in and protect her.

Her brother and two of her sisters testified to numerous occasions when she had delusions of persecution prior to the marriage, and that this fact was known to the respondent when he married her.

The two alienists who examined her four months after the marriage for the purpose of having her committed to the asylum testified she was then unquestionably suffering from paranoia; that para-

noia was an incurable disease, and her hallucinations were then so deeply fixed in her mind that the disease itself must have existed for several years prior to the examination. Their testimony on this subject was in no way contradicted, and was corroborated in many respects by the testimony of other witnesses. It is undoubtedly true she knew she was being married when the ceremony took place, and appreciated, so far as her diseased intellect would permit, the nature, effect, and consequences of the act, but that does not make the marriage valid or justify the court in refusing to set it aside. The testimony of the medical experts is undisputed to the effect that a paranoiac, when not under the control of the delusion, is capable of acting sanely upon matters not connected with it.

I think the judgment should be reversed, and a new trial granted.